# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
## Judge William J. Martínez

Civil Action No. 12-cv-0265-WJM

RAGS OVER THE ARKANSAS RIVER, INC.,

      Petitioner,

v.

BUREAU OF LAND MANAGEMENT, an agency of the United States,
THE DEPARTMENT OF THE INTERIOR, an agency of the United States,
KEITH E. BERGER, in his official capacity as Field Manager for the Royal Gorge Field
Office of the Bureau of Land Management,
THOMAS HEINLEIN, in his official capacity as District Manager for the Front Range
District of the Bureau of Land Management,
HELEN HANKINS, in her official capacity as Colorado State Director of the Bureau of
Land Management, and
SALLY JEWELL, in her official capacity as the Secretary of the Department of the
Interior,

      Respondents,

and

OVER THE RIVER CORPORATION,

      Intervenor-Respondent.

---

## ORDER AFFIRMING AGENCY DECISION

---

Plaintiff Rags Over the Arkansas River, Inc. ("Petitioner" or "ROAR") brings this

action against the Bureau of Land Management ("BLM"), the Department of the Interior

("DOI") (together "Agencies"), Keith Berger, Thomas Heinlein, and Helen Hankins in

their official capacities as officials at the BLM, and Sally Jewell, in her official capacity

as Secretary of the DOI (collectively "Respondents").  This matter is before the Court

pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, on

Petitioner's appeal of the Agency's approval of the temporary art installation proposed

to be constructed on federal land by Intervenor Over the River Corporation ("OTR").

(*Id.*)  For the reasons set forth below, the Agency's decision is affirmed.

## I.  LEGAL STANDARD

Petitioner challenges Respondents' actions under both the National

Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act

("FLPMA").  However, as neither NEPA nor FLPMA creates a private right of action, *see*

*Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998), Petitioners must bring their

claims pursuant to the judicial review procedures of the APA.

The APA instructs that federal agency action must be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" or "without

observation of procedure required by law."  5 U.S.C. §§ 706(2)(A) & (D).  "In

determining whether the agency acted in an arbitrary and capricious manner, we must

ensure that the agency decision was based on a consideration of the relevant factors

and examine whether there has been a clear error of judgment."  *Colo. Envtl. Coal. v.*

*Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999).  However, a court may not substitute

its judgment for that of the agency nor set aside the decision merely because it

disagrees with the result.  *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,

462 U.S. 87, 97 (1983).  Rather, the court may only find a decision arbitrary and

capricious

> if the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997). Though a court must engage in a "substantial inquiry," *Lamb v. Thompson*, 265 F.3d 1038, 1046 (10th Cir. 2001), that is "searching and careful," *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 378 (1989), "the ultimate standard of review is a narrow one," *id*.

Review of an agency's decision is usually deferential. *See Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021 (10th Cir. 2002). The deference given "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Congress v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). If the agency's exercise of discretion is truly informed, then the court defers to it. *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002). However, if the record shows that the agency prejudged the issues, then deference to the agency's decision is diminished. *See Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002).

## II. FACTUAL BACKGROUND

The Arkansas Headwaters Recreation Area ("AHRA") is located in Chaffee, Lake, Pueblo, and Freemont Counties in south-central Colorado. The AHRA is comprised of the surface of the Arkansas River, lands owned by the State of Colorado, and lands owned by the United States which are administered by BLM. (Record ("R.")

(ECF No. 32) 6752 at 69656, 69688-94.)  The AHRA is managed jointly by federal and state agencies—including BLM, the United States Forest Service, and Colorado Parks and Wildlife—who attempt to balance the popularity of the Arkansas River with protection of wildlife and other resources in the area.  (R. 6789 at 76977-78.)  To this end, the agencies developed the Arkansas River Recreation Management Plan ("ARRMP") in 1989.  (R. 6752.)  In pertinent part, the ARRMP requires that only leases, permits, and easements consistent with the Royal Gorge Resource Management Plan ("Royal Gorge RMP") will be granted.  (R. 6752 at 69764-66.)

The Royal Gorge RMP was adopted in 1996 and governs BLM resource management in the State of Colorado east of the Continental Divide.  (R. 6738 at 68336.)  The land managed under this RMP is divided into ten sub-regions, including the Arkansas River Subregion (Eco-Subregion #1), which includes 125,000 acres along the Arkansas River corridor between Leadville and Pueblo, Colorado.  (R. 6744 at 68894.)  The Arkansas River Subregion contains the Arkansas Canyonlands Area of Critical Environmental Concern ("ACEC"), which extends from Texas Creek to Cottonwood Creek and is the eastern portion of Bighorn Sheep Canyon along the Arkansas River.  (R. 6747 at 69094.)  Bighorn Sheep Canyon is also designated a Class II in the BLM's Visual Resource Management system, which is designed to protect natural scenic values.  (R. 6742 at 68767.)

In 1996, artists Christo and Jean-Claude approached BLM proposing to construct a temporary art installation (the "Project") over the Arkansas River.  (R. 6789 at 76636.)  After some public input and testing, the proposal was put on hold until 2005, when OTR, on behalf of Jean-Claude and Christo, approached BLM and the Colorado

4

State Parks to reinitiate the Project.  After significant revisions, the Project is proposed to consist of 5.9 miles of steel cables, anchored on the riverbanks between 8 and 25 feet above a 42-mile stretch of the Arkansas River, over which fabric panels will be suspended.  (R. 6057 at 45437.)  The Project consists of three phases: (1) installation of the anchors and cables, which is expected to take approximately 28 months; (2) a two-week display during which the fabric panels will be "blossomed"; and (3) removal of the supports over approximately 3 months.  (R. 6057 at 76590-91.)  In all, the Project is anticipated to be installed, displayed, and removed within three years.  (R. 6057 at 45441-43.)

As 160 acres of the Project are planned to be located on federal land, the Project required BLM approval, which is conditioned on BLM finding that the Project is in compliance with the Royal Gorge RMP.  (R. 6057 at 45436.)  Based on the scope of the Project, BLM published a Notice of Intent in the Federal Register in 2006, stating its intent to prepare an Environmental Impact Study ("EIS") for the Project.  (R. 4739 at 28356; 6057 at 45438, 45493.)  After its initial review, on July 28, 2008, BLM found the Project to be in "broad conformance" with the Royal Gorge RMP, but intended to use the EIS process to study the issue more closely.  (R. 6100 at 47846; 6789 at 76643-46.)

BLM enlisted the support of more than thirty cooperating state and federal agencies and, in July 2010, released a Draft Environmental Impact Statement ("DEIS") for public comment.  (R. 6057 at 45493; 6789 at 76657.)  The public made more than 3,5000 submissions during the public comment period, which totaled more than 4,500 individual comments.  (R. 6789 at 76657.)  After considering these comments and

adjusting its analysis of the Project in response, in July 2011, BLM issued the Final Environmental Impact Statement ("FEIS").  (R. 6057 at 45493.)

In November 2011, BLM issued a Record of Decision ("ROD") finding that the Project conformed to the Royal Gorge RMP and authorizing the land use under 43 C.F.R. § 2920.1-1(b).  (R. 6057.)  In approving the Project, BLM imposed a variety of mitigation and avoidance measures.  For example, during the installation phase, BLM disallowed work during bighorn sheep lambing season and migratory bird nesting season, and placed restrictions on lane closures during certain times of the year.  (R. 6057 at 45461-92.)  BLM also required OTR to fully remediate the Project area, and to post a significant bond to ensure that the remediation is completed.  (*Id*. at 45490-92.) BLM found that its mitigation and remediation plans reduced concerns regarding potential negative impacts on the area's natural resources to the point that the Project could be approved.  (*Id*. at 45448-51.)

After the ROD was issued, a third party appealed the decision to the Department of Interior Board of Land Appeals ("Board").  (R. 8358.)  On June 28, 2013, the Board issued its decision upholding the BLM's land use authorization.  (R. 8329.)  The Board's decision constitutes the final agency action.  *See* 43 C.F.R. § 4.403(a).

### III.  ANALYSIS

Petitioners allege that Respondents violated the APA by failing to comply with the requirements of the FLPMA and NEPA.  The Court will discuss each in turn below.

### A.    NEPA Challenges

The National Environmental Policy Act is "[t]he centerpiece of environmental

regulation in the United States". *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009). NEPA's "twin aims" require a federal agency "to consider every significant aspect of the environmental impact of a proposed action," and to "inform the public that it has indeed considered environmental concerns in its decision-making process." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983).

"Before an agency may take 'major Federal actions significantly affecting the quality of the human environment,' an agency must prepare an environmental impact statement ('EIS') in which the agency considers the environmental impacts of the proposed action and evaluate[s] 'alternatives to the proposed action,' including the option of taking 'no action.'" *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(d)). The EIS requirement serves two important functions: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). NEPA specifies five specific issues which must be addressed in the EIS:

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of

> long-term productivity, and
> (v) any irreversible and irretrievable commitments of
> resources which would be involved in the proposed action
> should it be implemented.

42 U.S.C. 4332(2)(C).  In addition to these procedural requirements, "[a]t all stages

throughout the process, the public must be informed and its comments considered."

*Richardson*, 565 F.3d at 704 (citing 40 C.F.R. §§ 1503.1, 1505.2, 1506.10).

NEPA does not circumscribe "the substantive action an agency may take—the

Act simply imposes procedural requirements intended to improve environmental impact

information available to agencies and the public."  *Id.*  "The Act does not require

agencies to elevate environmental concerns over other appropriate considerations, . . .

it requires only that the agency take a 'hard look' at the environmental consequences

before taking a major action."  *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288

F.3d 1205, 1207-08 (10th Cir. 2002) (citing *Baltimore Gas*, 462 U.S. at 97).  That is,

NEPA "'merely prohibits uninformed—rather than unwise—agency action.'"

*Richardson*, 565 F.3d at 704 (quoting *Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 351 (1989)).

The Court reviews an agency's NEPA process under the deferential abuse of

discretion standard of review.  *Citizens Against Burlington*, 938 F.2d at 194.  As the

Supreme Court has observed, "once an agency has made a decision subject to NEPA's

procedural requirements, the only role for a court is to insure that the agency has

considered the environmental consequences".  *Strycker's Bay Neighborhood Council,*

*Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980) (*per curiam*) (citation and quotation

omitted).  The Tenth Circuit has held that the district court's objective in reviewing an

8

EIS "is not to 'fly speck' the environmental impact statement, but rather, to make a pragmatic judgment whether the environmental impact statement's form, content and preparation foster both informed decision-making and informed public participation." *Custer Cty. Action Assoc. v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001).  The Court is to apply "a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat [NEPA's] goals of informed decision making and informed public comment."  *Fuel Safe Washington v. F.E.R.C.*, 389 F.3d 1313, 1323 (10th Cir. 2004) (internal quotation omitted).

Petitioner contends that BLM violated NEPA by failing to take a "hard look" at the impacts the Project will have on: (1) the bighorn sheep population in the area and; (2) traffic flow through and around the Project.  The Court will discuss each of these issues below.

### 1.   Bighorn Sheep

Petitioner contends that the Agencies failed to consider the full impact of the Project on the population of bighorn sheep in the area.  (ECF No. 49 at 53.) Specifically, Petitioner argues that the studies relied on by BLM were too old and not specific to the Project.  (*Id*.)  Petitioner also argues that BLM failed to make the appropriate findings required when it acknowledged that it could not fully predict the impact of the Project on the bighorn sheep population.  (ECF No. 56 at 18-19.)

Petitioner first argues that BLM erred by considering only the disruptions to bighorn sheep caused by recreational activities, and by failing to consider the effect drilling would have on the bighorn sheep.  (ECF No. 49 at 53.)  However, the record

9

shows that BLM explicitly considered the impact of activities similar to drilling in an attempt to predict how installation of the Project (including drilling) could impact the bighorn sheep.  For example, one of the many studies cited in the DEIS involves helicopter use in the Grand Canyon, and examines its effect on the bighorn sheep population.  (R. 6427.)  BLM's NEPA process (including the DEIS, FEIS, and ROD) repeatedly notes that the Project is novel, and that studies have not been performed that precisely examine how wildlife will respond to a temporary art installation of this magnitude.  (*See* R. 6788 at 76152, 76159.)  While the studies cited by BLM are not directly analogous to the drilling activities that will take place here, they certainly show that BLM did not ignore the potential impact on bighorn sheep caused by the noise of drilling during installation of the Project.

Petitioner also argues that BLM erred by considering herd-specific studies that were fifteen years old when the life-span of a bighorn sheep is only nine years.  (ECF No. 49 at 54.)  However, Petitioner does not point to any more recent study that was available to BLM show or show that the bighorn sheep population has changed so significantly that the studies considered are no longer sufficiently accurate for NEPA review purposes.  Petitioner cites no authority requiring BLM to have relied on the best or most recent scientific evidence available.  Petitioner also fails to cite any studies that BLM should have considered in order to satisfy the "hard look" requirement.  As the party challenging BLM's approval of the Project, Petitioner bears the burden to show that BLM's decision was arbitrary and capricious.  *See Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) ("A presumption of validity attaches to the agency action and the burden of proof rests with the [plaintiffs] who

challenge such action.")  Petitioner has not met that burden here.

In its Reply Brief, Petitioner argues for the first time[1] that BLM failed to comply with 40 C.F.R. § 1502.22, which outlines the steps an agency must take when information about certain environmental impacts is unavailable.  (ECF No. 56 at 18-19.) Having reviewed the record, the Court disagrees.  The Tenth Circuit has refused to "give a hyper-technical reading" of § 1502.22, and declined to require an agency to parrot the requirements contained therein.  *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999).  The FEIS prepared in this case noted that, given the novelty of the Project, the impacts on bighorn sheep could not be perfectly predicted. (R. 6792.)  This satisfies § 1502.22(b)'s requirement that an agency "make clear that . . . information is lacking."  The FEIS then disclosed the more than 20 studies that BLM—in consultation with the Colorado Division of Wildlife—relied on to predict, as accurately as possible, the impacts of the Project on bighorn sheep.  (R. 6789 at 76752-56.)  Based on this effort, BLM concluded that impacts on bighorn sheep, as mitigated in accordance with the FEIS, would not be significant.  (R. 77845.)  The Court finds that these efforts constitute good faith compliance with § 1502.22.

Moreover, "[t]o demonstrate a violation of NEPA on the basis [of § 1502.22], Plaintiffs must show (1) the missing information is essential to a reasoned decision between the alternatives, and (2) that the public was unaware of the limitations of the

---

[1]  As this argument was first raised in the Reply Brief, the Court could have declined to consider it.  *See M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009) (noting that "the general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief.").  However, in the interests of justice, the Court decided to consider the issue and permitted Respondents to file sur-reply briefs addressing only this issue.  (ECF Nos. 66-67.)

data . . . relied on." *Trout Unlimited v. U.S. Dep't of Agric.*, 320 F. Supp. 2d 1090, 1111

(D. Colo. 2004) (citing *Dombeck*, 185 F.3d at 1172-73). In this case, Petitioner has

made no effort to show how any of the missing information was essential to making a

reasoned decision about the Project, and has also failed to show that the public was

unaware of the limitations in the data relied on by BLM. (ECF No. 56 at 18-19.) As

such, the Court concludes that Petitioner failed to meet its burden to show that BLM did

not take a "hard look" at the possible impact of the Project on the bighorn sheep

population. *See Wildearth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1240

(D. Colo. 2011) (finding no violation of § 1502.22 when plaintiff failed to show how the

agency could have obtained more precise information).

     2.   <u>Traffic</u>

     Petitioner contends that BLM violated NEPA by relying on an incorrect traffic

operations analysis, relying on traffic modifications that were not adopted in the FEIS,

and failing to meaningfully consider traffic mitigation measures for the duration of the

Project. (ECF No. 49 at 55.)

     With regard to the traffic operations analysis, Petitioner contends that BLM relied

heavily on an expert report prepared by David Evans and Associates, Inc. in June 2006

("Evans Report"). (ECF No. 49 at 56.) Petitioner complains that the Evans Report was

flawed, and that it was not reasonable for BLM to rely on its conclusions. (*Id*. at 56-57.)

In response, BLM points out that the Evans Report occurred early in the process, and

was not ultimately relied on in the FEIS. (ECF No. 55 at 49-52; 54 at 44-45.) Rather,

after the Evans Report was heavily criticized by the Colorado Department of

Transportation ("CDOT") and others, BLM undertook its own traffic analysis. (R. 6791

at 77292.)  CDOT was invited to be a cooperating agency in the NEPA process in 2007, and was directly involved with the traffic analysis and development of mitigation measures during the EIS process.  (R. 4232, 4291, 5696 at 37973-77.)  Thus, the record does not support Petitioner's argument that BLM relied too heavily on the Evans Report.

Next, Petitioner contends that the traffic modeling ultimately relied on to develop the mitigation measures in the FEIS was flawed because the VISSIM traffic modeling system did not take into account all of the factors that could potentially impact traffic flow.  (ECF No. 49 at 60.)  Petitioner's arguments on this point essentially ask the Court to second-guess traffic modeling prepared by BLM's experts, which was already subjected to the comment and review process.  During the NEPA process, BLM considered the same criticisms raised by Petitioner here, and made some responsive adjustments to the modeling.  (R. 4294; 6791 at 77292, 77702.)  The Court concludes that BLM's traffic modeling system adopted in the FEIS was rational, which is all that is required under NEPA.  *See Natural Res. Def. Council v. Herrington*, 768 F.2d 1355, 1385 (D.C. Cir. 1985) (holding that the court "will defer to an agency's judgment to use a particular model if the agency examines the relevant data and articulates a reasoned basis for its decision."); *Jones v. Peters*, 2007 WL 2783387, at *23 (D. Utah Sept. 21, 2007) (NEPA does not require court to choose between different interpretations of traffic modeling data but must only determine whether the agency's choice of method and interpretation was reasonable).

Petitioner also argues that BLM relied on flawed traffic modifications, including plans to upgrade the Texas Creek Bridge from one to two lanes, and plans for a 900-

space parking lot, neither of which were included in the FEIS or the ROD.  (ECF No. 49 at 58.)  BLM notes that, although these traffic modification options were considered in the DEIS, the FEIS makes clear that they will not ultimately be implemented.  (ECF No. 55 at 55.)  BLM points out that Petitioner's citations to the record all pre-date the FEIS process, and that the traffic assessment supporting the FEIS removed consideration of the Parkdale parking lot.  (R. 6791 at 77325.)

The Court's review of the record supports BLM's position.  The FEIS plainly states that no upgrades to the Texas Creek bridge are proposed, and that all consideration of the Parkdale 900-space parking lot was removed.  (R. 6791 at 77325-26.)  Any flaws noted by Petitioner were corrected through the NEPA process—between development and consideration of the DEIS, response to the comments obtained in response to the DEIS, and development of the FEIS.  NEPA does not permit the Court to second-guess BLM's choices with regard to traffic management, so long as its decision making process was reasonable.  *Druid Hills Civic Ass'n v. Fed. Highway Admin.*, 772 F.2d 700, 711 (11th Cir. 1985) (a federal court does not sit "as a 'super professional transportation analyst' or decide which party utilized the better methodology in conducting its . . . analysis.  Rather, the district court simply determined whether the appellees' choice of methodology had a rational basis, consistently applied, taking relevant considerations into account.").

Petitioner next argues that BLM failed to adequately consider all traffic mitigation measures, and failed to provide a reasonably thorough discussion of specific mitigation measures.  (ECF No. 49 at 61-62.)  Petitioner contends that BLM's analysis of the mitigation measures does not "show an understanding of the severity of adverse

14

effects". (*Id*. at 61.)  An agency considering a potential action must include a discussion of possible mitigation measures in a DEIS.  *See* 40 C.F.R. §§ 1508.25(b)(3), 1502.14(f), 1502.16(h), 1505.2(c); *see also Robertson*, 490 U.S. at 351-52.  Although an agency need not fully develop a mitigation plan which will mitigate any environmental harm before it can act, *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992), it must include a "reasonably complete [discussion of mitigation measures] in order to properly evaluate the severity of the adverse effects of a proposed project before making a final decision." *Dombeck*, 185 F.3d at 1173.

The FEIS in this case explicitly discusses 13 mitigation measures related to traffic and transportation.  (R. 6788 at 76519-21.)  Petitioner contends that these are not adequate to satisfy NEPA because there was no analysis of the effectiveness of these measures.  However, the record shows that many of the mitigation measures were considered in the traffic modeling.  (R. 6791 at 77324-32, 44342-75.)  Thus, the Court concludes that the effect of the mitigation measures was considered during the NEPA process.

Petitioner attempts to analogize this case to *Dine Citizens Against Ruining Our Environment v. Klein*, in which the agency found that a drilling operation would result in no significant environmental impact based in large part on a yet-to-be-developed mitigation plan.  747 F. Supp. 2d 1234, 1258 (D. Colo. 2010).  In *Dine*, the Court noted that there were "no detailed mitigation plans upon which [the agency] could have relied", and found that reliance on a hypothetical future mitigation plan was arbitrary and capricious.  *Id*.  Having reviewed the record in this case, the Court finds that *Dine* is

15

easily distinguishable.  Here, the BLM outlined 13 specific mitigation measures in the FEIS and, although some of these measures are yet to be fully developed, most are detailed and specific.  For example, the FEIS states that "[o]nly one lane of US 50 would be allowed to be closed at a time at any one location" and that "[n]o more than 15 minutes delay time per vehicle would be allowed at each work zone at any one time".  (R. 6788 at 76519-21.)  The Court concludes that the FEIS's mitigation plan is sufficiently detailed so as to show that BLM adequately considered mitigation measures.  As such, Petitioner has failed to show that BLM's consideration of the potential traffic impacts of the Project violated NEPA.

### 3.   Need for Supplemental FEIS

Petitioner contends that BLM should have issued a supplemental EIS when it eliminated the Parkdale Visitor Center and its associated 900-space parking lot between the time the DEIS was released and when the FEIS was drafted.  (ECF No. 49 at 63.)  Petitioner contends that this change "is surely relevant to environmental concerns", and "needs to be reflected in the [traffic] monitoring" such that a supplemental EIS is necessary to comply with NEPA.  (*Id.*)

A supplemental EIS is required when it is necessary to update an existing EIS because of either "substantial changes in the proposed action" or the development of "significant new circumstances or information" pertaining to that action or its impacts.  40 C.F.R. § 1502.9(c)(1) (1979); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 72 (2004).  To comply with NEPA, an agency must take a "hard look" at any new information and assess whether supplementation might be necessary.  *Marsh*, 490 U.S. at 385.  When determining whether a supplemental EIS is necessary due to new

16

information or changed circumstances, agencies can utilize "non-NEPA procedures." *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004).

In this case, OTR removed the Parkdale Visitors Center from its plans before the FEIS was prepared.  (R. 6791 at 76657.)  Thus, the traffic modeling relied on by the FEIS does not include the Parkdale Visitors Center or its proposed parking lot.  (R. 6791 at 77325, 77337-38.)  As this occurred before the FEIS was prepared, the Court finds that BLM took a "hard look" at the new information, and that such information was adequately considered before the Project was approved.  *See Friends of Marolt Park v. U.S. Dep't of Trans.*, 382 F.3d 1088, 1096 (10th Cir. 2004) (a decision not to issue a supplemental EIS is not arbitrary and capricious if "the relevant environmental impacts have already been considered.").

Additionally, although the Parkdale Visitors Center was part of the preferred alternative in the DEIS, other alternatives were considered that did not include the parking lot.  (R. 6768 at 724767, 72511.)  The traffic analyses in the DEIS considered all of these alternatives, including those which did not include the parking lot.  (R. 6769 at 72954-55.)  The DEIS showed that the Parkdale Visitors Center would create a significant bottleneck, and the traffic modeling after removal of the Parkdale Visitors Center and parking lot showed that such removal would decrease congestion and traffic delays.  (R. 6789 at 76577, 6791 at 77728-29.)  This record shows both that BLM adequately considered all scenarios—including the possibility of not having the parking lot—and that removal of the parking lot actually benefits the environment rather than causing additional harm.  This further supports the BLM's conclusion that no supplemental EIS was required when the Visitors Center and parking lot were removed

17

from the final plan. *Friends of the Bow*, 124 F.3d at 1219 ("[A] reduction in environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact.").

Given all of the above, the Court concludes that BLM did not act arbitrarily and capriciously when deciding not to issue a supplemental EIS after the Parkdale Visitors Center and its associated parking lot were removed from the Project.

4.      NEPA Conclusion

At its heart, NEPA is a "procedural" statute, not an "environmental" statute. *Park Cnty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 620 (10th Cir. 1987). NEPA professes no public policy concerning the protection of the environment or natural resources; rather, it "requires only that an agency take a 'hard look' at the environmental consequences of any major federal action." *Id*.; *see also Marsh*, 490 U.S. at 385*; Richardson*, 565 F.3d at 704. The purpose of NEPA is "to insure a fully informed and well-considered decision," not to dictate a particular outcome. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) ("NEPA merely prohibits uninformed—rather than unwise—agency action").

Petitioner has noted various environmental effects that the Project will have on federal lands in the United States, but its argument essentially boils down to a disagreement with the BLM's approval of the Project. Such disagreement is not sufficient to warrant reversal. As long as an agency has complied with the procedural requirements of NEPA, the Court should not second-guess that agency's decision. *See*

18

*Robertson*, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.")

Having reviewed significant portions of the administrative record in this case, the Court concludes that BLM complied with NEPA's procedural requirements, and that its approval of the Project was not arbitrary and capricious.  As such, the Court concludes that BLM's approval of the Project did not violate NEPA.

**B.     Federal Land Policy Management Act**

Petitioner also argues that BLM's consideration and approval of the Project violated the FLPMA, which requires the BLM to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a); (ECF No. 49 at 33).  Multiple use requires balancing the competing uses of land, 43 U.S.C. § 1702(c); sustained yield requires the BLM to control depleting uses over time, *id*. § 1702(h).  *See also Norton*, 542 U.S. at 58.  BLM does so by using a "multi-step planning and decisionmaking process" that begins with the formation of a land use plan for a geographic region called a resource management plan ("RMP").  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010);  *see* 43 C.F.R. § 1601.0-5(n) (describing contents of resource management plan).  The RMP "does not, however, include a decision whether to undertake or approve any specific action. Specific projects are reviewed and approved separately, but must conform to the relevant [plan]."  *Theodore Roosevelt*, 616 F.3d at 504 (citing 43 C.F.R. §§ 1601.0-5(n), 1610.5-3(a)); *see also Norton*, 542 U.S. at 59-60.

19

"Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment."  43 C.F.R. § 1601.0-5; *see also W. Watersheds Proj. v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1268 (10th Cir. 2013) (BLM's actions must be "clearly consistent with the terms, conditions, and decisions of the approved plan.").  When an action is not consistent with the RMP, the RMP may be amended.  *Id*. § 1610.5-3(c).

Petitioner argues that BLM applied the wrong legal standard when approving the Project, that its findings under FLPMA were arbitrary and capricious, and that it failed to give the appropriate heightened scrutiny to the portions of the Project that affect the Arkansas Canyonlands ACEC.  The Court will address each of these arguments in turn below.

       1.    <u>Governing Legal Standard</u>

Petitioner argues that BLM applied an incorrect legal standard in approving the Project because it found that the Project was "broadly consistent" and "not inconsistent" with the Royal Gorge RMP. (ECF No. 49 at 34.)  Petitioner contends that the Project can be approved only if BLM finds that it is "clearly consistent" with the RMP.  (*Id*. at 35.)  Petitioner also argues that BLM was required to consider the specific terms, conditions, and decisions of the RMP rather than looking only at the broad goals.  (*Id*. at 34.)

While Petitioner correctly cites the regulations interpreting FLPMA, it does not show that the "clearly consistent" standard applies in this case.  Significantly, the parties agree that the Project is a one-of-a-kind installation that was not specifically

contemplated when the Royal Gorge RMP was drafted, which significantly impacts the applicable standard under which BLM was to consider approval of the Project.  BLM cites its NEPA Handbook which states that, when an RMP is silent about an activity, the appropriate inquiry is whether "the activity contributes to meeting plan goals and objective and is not inconsistent with the plan, and hence it can be considered to be in conformance."  (R. 6109 at 47912.)  Courts are generally required to defer to an agency's interpretation of its own regulations, and Petitioner cites no good reason as to why the Court should not defer to the BLM's handbook in this case.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003) ("[F]ederal courts are required to defer to an agency's reasonable interpretation of its own guidelines."). Moreover, Petitioner cites no cases applying the "clearly consistent" standard or holding that BLM must make a specific finding that an activity is "clearly consistent" with an RMP when that activity was not contemplated at the time the RMP was adopted.  In contrast, the Supreme Court has held that FLPMA bars BLM from taking actions that are "inconsistent with the provisions of the land use plan."  *Norton*, 542 U.S. at 69. Thus, the fact that BLM failed to make a finding that the Project was "clearly consistent" with the RMP does not warrant reversal.

The Court also finds that BLM was justified in looking at the broad goals of the RMP rather than its specific terms, conditions, and decisions.  Because the Project is so novel, it is unsurprising that the RMP's specific terms, conditions, and decisions—which cover topics such as how much acreage will be devoted to livestock grazing and mineral mining—would not provide much guidance as to whether the

Project was in conformance with the RMP's overall goals.  After engaging in a full

NEPA process, the BLM found that the Project would "create an added recreation

attraction" that would "draw additional visitors that would likely participate in recreational

uses besides viewing fabric panels", and that this conformed with the RMP's overall

goal of using the natural resources in a manner that supports local and regional

economies, while protecting the resources from irreparable damage.  (R. 6788 at

76406; 6789 at 76643; 6747 at 69081.)   Because the Project w as not within the RMP's

contemplation at the time it was developed, the Court concludes that BLM's general

focus on the overall goals of the RMP was not arbitrary and capricious.  *See Ore.*

*Natural Desert Ass'n v. Shuford*, 2007 WL 1695162, at *11 (D. Ore. June 8, 2007)

("FLPMA imposes broad and general management goals rather than procedural and or

substantive requirements for BLM.").

> 2.    Whether BLM's Compliance Finding was Arbitrary and Capricious

Petitioner argues that BLM's finding that the Project complied with the RMP was

arbitrary and capricious.  (ECF No. 49 at 37.)  Specifically, Petitioner contends that the

Project cannot be consistent with the RMP because it is in conflict with more terms,

conditions, and decisions than those with which it was aligned.  (*Id*. at 38.)  Petitioner

also argues that BLM should have been required to amend the RMP in order to approve

the Project.  (*Id*. at 39-41.)

The record shows that BLM considered the relevant terms, conditions, and

decisions in the Royal Gorge RMP, made findings as to compliance with those terms

and conditions (and inconsistency where appropriate), and received public comment on

the proposal.  (R. 6057 at 45449; 6788 at 76404-35; 6789 at 76644, 76983-85.)  Early

in the NEPA process, the BLM specifically identified the conditions with which the

Project was consistent, and identified those with which there was a potential conflict.

(R. 6057 at 45449.)  It then engaged in the EIS process, which allowed it to adopt

mitigation measures to minimize the potential conflicts.  Petitioner cites no authority

showing that an activity can only be approved where it furthers more of the specific

terms and conditions of the RMP than it could potentially hinder.  The BLM is in the best

position to consider all of the aspects of the RMP and determine consistency, and it did

so through the NEPA process.  This is precisely the type of inquiry that calls on the

agency's expertise, and thus requires the Court's deference. *Friends of the Bow*, 124

F.3d at 1218; *see also Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1055-56

(9th Cir. 2012) (the court is to provide "substantial deference" to the agency's

interpretation and application of its own management direction).

Petitioner takes issue with some of BLM's early statements regarding

compliance, but this ignores the fact that BLM engaged in a thorough consideration of

the Project's impacts on natural resources and the Royal Gorge RMP through the

NEPA/EIS process.  Petitioner's arguments suggest that the BLM must favor

preservation of natural resources and wildlife above all other relevant considerations.

(*See* ECF No. 49 at 28.)  Much as the Court may wish that were the case under the

statute, the FLPMA requires that BLM manage the federal lands under its control for

multiple uses, and this includes approving projects that could deplete resources.   43

U.S.C. § 1702(h).  The record shows that BLM considered its multiple use mandate in

this case and made the appropriate findings that the Project complies with the Royal

Gorge RMP.  (R. 6788 at 76406; 6789 at 76643; 6747 at 69081.)

23

Having reviewed the relevant portions of the record, the Court concludes that BLM's determination that the Project complied with the Royal Gorge RMP was not arbitrary and capricious.

### 3.   ACEC Designation and Effect on Findings

Petitioner further argues that the BLM violated FLPMA by failing to prioritize the designation of Areas of Critical Environmental Concern ("ACECs").  (ECF No. 49 at 41.) When developing land use plans, FLPMA requires the BLM to "give priority to the designation and protection of areas of critical environmental concern."  43 U.S.C. § 1712(c)(3).  FLPMA defines ACECs as "areas within public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards."  *Id*. § 1702(a). The priority afforded ACECs reflects Congress' intent to elevate the designation and protection of ACECs over BLM's default management for "multiple use."  *Id*. § 1732(a). However, FLPMA states that the "identification of [ACECs] shall not, of itself, change or prevent change of the management or use of public lands."  *Id*. § 1711(a).

It is undisputed that a portion of the Project falls within the Arkansas Canyonland ACEC.  (R. 6747 at 69094.)  The RMP for this area identifies the following special management directives:  preservation of scenic, historic, and cultural values; endangered peregrine falcons; key raptor habitat area; bighorn sheep; fisheries; and access to Arkansas River.  (R. 6738 at 68705.)

Petitioner contends that BLM was permitted to approve the Project only upon a finding that the Project would "protect or enhance" the natural attributes of the area.

24

(ECF No. 49 at 42.) Petitioner argues that BLM failed to comply with the "special management directives" of the ACEC, which require BLM to protect special resources, not impair visual resources, and make decisions consistent with required stipulations. (*Id*. at 43-51.) Petitioner specifically takes issue with BLM's findings regarding impact of the Project on bighorn sheep, raptors, and visual impact. (*Id*.)

The fundamental weakness of Petitioner's argument is that the regulations applicable to ACEC lands prohibit BLM from taking action that would cause "irreparable damage" to important resources. 43 C.F.R. § 1601.0-5(a). Through the NEPA process, BLM looked at the Project's impact on each of the ACEC's special management directives. (R. 6788 at 76405-35 (recreational access), 76452-64 (visual resources), 76169-70, 76207-11 (avian wildlife including peregrine falcons and other raptors), 76152-61 (bighorn sheep), 76178-82 (aquatic habitat and species).) After completing this review, and noting real and potential short-term impacts on the environment, BLM found that the Project would "not result in any <u>irreparable</u> damages to the Arkansas Canyonlands ACEC." (R. 6057 at 45451 (emphasis added).) The Project is a temporary installation and BLM conditioned its approval of the Project on significant remediation requirements and the posting of a bond to ensure compliance with same. (R. 6057 at 45451, 45462, 45490-92.) Having reviewed the relevant portions of the record, the Court concludes that this finding was well-informed by the NEPA process, and was not arbitrary and capricious.

Petitioner argues that the Project should not have been approved because the BLM found that the bighorn sheep herd in the Arkansas Canyonlands ACEC "may be moderately affected over the long term." (*Id*. at 42 (citing R. 6789 at 76737).) While

25

this is an accurate cite to the record, Petitioner again ignores FLPMA's emphasis on irreparable damage.  In its NEPA process, the BLM found that the Project's impact on the bighorn sheep population was "largely unpredictable", and therefore made plans to implement a monitoring and mitigation plan submitted by and to be administered by the Colorado Department of Wildlife.  (R. 6788 at 76152, 77773-85.)  BLM has also required OTR to post a $200,000 bond to implement any required mitigation measures.  (R. 6057 at 45464; 6791 at 77779-81.)  With these monitoring and mitigation measures in place, BLM found that there would be no irreparable damages to the bighorn sheep population, and this finding is not arbitrary and capricious.

With regard to the raptor population, BLM noted the potential for disturbances to nesting areas and possible bird strikes of the cables, and found that some short-term raptor displacement could occur.  (R. 6788 at 76207; 6057 at 45450.)  In recognition of these conflicts, BLM imposed restrictions on installation and removal of the Project during migratory bird nesting season, mandated buffer zones around known raptor nesting areas, and required cables to be marked with visual identifiers.  (R. 6057 at 45464-67.)  With these measures in place, BLM found that there would be no irreparable impact to the raptor population, and the Court concludes that this finding was not arbitrary and capricious.

Petitioner next contends that BLM violated its own policies regarding Visual Resource Management ("VRM").  (ECF No. 49 at 44-45.)  It is undisputed that Arkansas Canyonlands ACEC is designated as a VRM Class II site.  (R. 6789 at 76986.)  Class II areas are designed to "retain the existing character of the landscape.  The level of change to the characteristic landscape should be low.  Management activities may be

seen, but should not attract the attention of the casual observer.  Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape."  (R. 6680 at 67489; 6752 at 69707.)

BLM recognized that "this project is a short-term conflict with visual quality while the panels are in place."  (R. 4303 at 27114.)  However, BLM found that the Project "would not create long-term changes to the landscape that conflict with [RMP] guidance; most visual effects would vanish after removal of facilities and restoration of disturbed sites."  (R. 6788 at 76463.)  Thus, BLM found that "Class II objectives would be met in the long term following removal with application of design features and mitigation measures.  (*Id*.; 6788 at 76464; 8329 at 84635.)

Petitioner contends that even short-term disruption of the visual attributes is not allowable, and because the entire objective of the Project is to create a contrast between the natural landscape and the draping fabric, it is fundamentally incompatible with the area's VRM Class II designation.  (ECF No. 49 at 45-46.)  However, Petitioner cites no authority showing that BLM cannot allow short-term disruption of the area's visual qualities.  To adopt Petitioner's position would require the Court to ignore FLPMA's emphasis on irreparable injury to the special management resources in an ACEC.  Given the *temporary* nature of the Project and BLM's plan for mitigation and remediation of the visual resources it will disturb, the Court concludes that BLM's finding that the Project complies with the VRM Class II objectives is not arbitrary and capricious.

Finally, Petitioner argues that BLM failed to comply with the Arkansas Canyonlands' Special Management Stipulations, specifically a "no surface occupancy"

("NSO") stipulation.  (ECF No. 49 at 48-50.)  Special management stipulations "control

BLM's management program for the area and no activity incompatible or inconsistent

with those requirements shall be allowed."  45 Fed. Reg. 57318, 57322 (Aug. 27, 1980).

NSO stipulations prohibit occupancy or disturbance of the land surface to protect

scenic, natural, and cultural values in a particular area.  (R. 6747 at 69095, 69221.)

The Royal Gorge RMP includes a NSO stipulation that applies to fluid mineral

leasing.  (R. 6747 at 69089.)  Petitioner admits that the Project is not a permit for fluid

mineral mining, but argues that BLM has "never stated that the stipulations do not apply

to management decisions that would have similar disturbances to protected land."

(ECF No. 49 at 49.)  The Court finds this argument nonsensical.  The Royal Gorge

RMP goes to great lengths to discuss different restrictions for different resources and

industries.  There are obvious distinctions between mineral mining—which often

involves deep drilling and extraction of oil and gas—and the Project's installation of rods

with no extraction of minerals.  (*See* R. 8329 at 84632 (finding "the shallow holes to be

drilled for anchors under the Project are fundamentally different in size, scope, and

degree of impact on scenic and other special values" than those used in drilling for oil,

gas, and other fluid minerals).)

Petitioner asks the Court to ignore these distinctions and hold that any activity

that could potentially have similar attributes to mineral leasing should be governed by

the same NSO stipulation.  Notably, Petitioner cites no authority applying a Special

Management Stipulation or an NSO to an activity that plainly does not fall within its

gambit.  The Court rejects Petitioner's attempt to extend the scope of the NSO to

include the Project, and finds that BLM did not ignore any relevant Special

28

Management Stipulation when approving the Project.

In sum, Petitioner's arguments suggest that BLM should not be permitted to take any action that could potentially have a negative impact on a special management concern within an ACEC.  The Court concludes that this argument interprets the governing regulations in an overly restrictive manner, one not supported by the statute or applicable case law.  FLPMA states that designation of an area as an ACEC "shall not, of itself, change or prevent the management or use of public lands."  The record in this case shows that BLM was conscious of the special management concerns outlined in the RMP with regard to the Arkansas Canyonlands ACEC, and that such concerns were considered throughout the NEPA process.  (R. 6057 at 45458.)  BLM imposed conditions intended to mitigate some of the detrimental impacts, has devised significant monitoring and remediation measures, and has required the posting of a sizable bond to ensure compliance.  In reliance on all of this, BLM found that the Project would not result in any irreparable damage to the Arkansas Canyonlands ACEC (R. 6057 at 45451), and the Court concludes that this finding was not arbitrary and capricious.

## IV.  CONCLUSION

For the reasons set forth above, the Court concludes that BLM's approval of the Project was not arbitrary and capricious, and that BLM did not violation NEPA or FLPMA.  As such, the Court ORDERS that BLM's approval of the Project is AFFIRMED.

Dated this 2nd day of January, 2015.

BY THE COURT:

William J. Martinez
United States District Judge